FILED
10/13/2026 11:56 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026CH09872
Calendar, 9
40447779

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS COUNTY DEPARTMENT, CHANCERY DIVISION**

The Commuter Rail Division of the Northern Illinois Transit Authority and the Northeast Illinois Regional Commuter Railroad Corporation, d/b/a Metra
Plaintiffs,

v.

CPKC Ltd. and Soo Line Railroad Company,

Defendants.

No. 2026CH09872

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

**VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Plaintiffs, the Commuter Rail Division of the Northern Illinois Transit Authority ("CRD") and the Northeast Illinois Regional Commuter Railroad Corporation ("NIRCRC"), d/b/a Metra ("Metra"), form the second largest commuter rail system in the country. Metra is a critical piece of Illinois' policy initiative under the new Northern Illinois Transit Authority ("NITA") Act to create a more cohesive and useful public transportation system by increasing service and improving regional connectivity. As the world moves on from the "9-to-5" in-office workday, Metra's service must keep up, expanding beyond traditional "peak" period rush hour service to provide public transportation service for working commuters and passengers traveling around the region in what used to be called "non-peak" hours. In fulfilling its mission, Metra is committed to meeting the evolving public need for commuter and regional rail services while continuing its mutually beneficial and

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

longstanding cooperative relationships with the freight railroads that operate on the same tracks used by Metra.

Metra brings this action because Defendants CPKC Ltd. and Soo Line Railroad Company, d/b/a Canadian Pacific Kansas City (together, "CPKC"), which operate rail services on Metra's tracks, have refused to cooperate with Metra's transition toward the next generation of commuter service and blocked necessary changes in Metra's schedule in violation of the contract governing CPKC's use of two Metra-owned lines. Metra seeks both a declaration that Metra has the right to control, manage, and change the schedule of its trains on its own Milwaukee District North and West lines without CPKC's wrongful interference, and related injunctive relief as well as damages incurred as a result of CPKC's actions. In support of its request for declaratory and other relief, Metra alleges as follows:

## INTRODUCTION

1. Metra serves the Chicagoland area with 243 stations on 11 lines. Metra was created to serve the people by providing safe, reliable, efficient, and affordable commuter rail service to and from downtown Chicago and to enhance the economic and environmental health of the region. As Americans have demanded better public transportation in large metropolitan areas, Metra has grown to be one of the largest and most complex rail systems in North America, with a service area encompassing more than 3,700 square miles.

2. Metra consists of two governmental entities: the Commuter Rail Division of the Northern Illinois Transit Authority ("CRD"), which owns the Milwaukee District North and West lines property, and the Northeast Illinois

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

Regional Commuter Railroad Corporation ("NIRCRC"), which operates commuter rail service on behalf of CRD. The "Metra" service mark is a portmanteau of *met*ropolitan *ra*il and brands all CRD commuter rail services.

## A. Brief History of Metra

3. Chicago is the crossroads of the U.S. rail network and has had commuter rail service almost as long as it has trains. From its early days through when commuter rail service peaked in the mid-20th century, all commuter rail service in the region was provided by private railroads, almost all of which also operated freight service. By the late 1960s and 1970s, however, the U.S. rail industry was failing under decades of heavy-handed economic regulation and competition from the interstate highway network. These pressures led private railroads to de-emphasize passenger services, putting continued commuter service in the Chicago region at risk. To keep the commuter rail system running, the Illinois General Assembly created the Regional Transportation Authority (the "RTA") in 1974.

4. In 1980, the General Assembly created a related public corporation, NIRCRC, to provide commuter rail service on behalf of the RTA. In 1982, after the Chicago, Rock Island, and Pacific Railroad (the "Rock Island") and the Chicago, Milwaukee, St. Paul, and Pacific Railroad ("The Milwaukee Road") railroads both went bankrupt and discontinued commuter rail operations, NIRCRC directly operated commuter service on the Rock Island's and The Milwaukee Road's respective commuter lines in the Chicagoland region (the Rock Island and the Milwaukee District West and Milwaukee District North lines).

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

5. In 1983, the General Assembly reorganized the structure and funding of the RTA. CRD was made responsible for providing commuter rail service in northeast Illinois, and CRD provided those services either directly through NIRCRC or through purchase-of-service agreements between CRD and a handful of remaining private railroad companies.

6. In 1985, CRD adopted the "Metra" service mark for its commuter system. "Metra" brought a unifying identity to the diverse components of CRD's commuter rail service, no matter who owned the lines or operated the service. Today, NIRCRC operates commuter service for CRD on all but one of Metra's lines: the Metra Electric, Rock Island, SouthWest Service, Heritage Corridor, North Central Service, the two Milwaukee District lines (North and West), and three Union Pacific Railroad lines (North, Northwest, and West). Metra's BNSF Line is operated by BNSF Railway under a purchase-of-service agreement with CRD.

7. From 1985 through the first two decades of the 21st century, Metra strengthened its franchise and continually assessed the changing needs of its ridership. Consistent with the needs of its passengers, Metra largely arranged its service to meet the demands of Chicago region businesses, meaning commuter service in-and-out of Chicago's central business district. And then—a global pandemic altered everyone's plans. People at first worked from home, then increasingly remotely. The traditional "9-to-5" workday, which had defined American business since World War II, expanded into a "365/24/7" model that fundamentally altered how commuters traveled to and from work.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

8. The future for Metra's commuter service looked different, first at the height of the pandemic and then as businesses began to establish new norms for their workers. Commuter use was down from historical highs but began to settle into different patterns as businesses changed "in-office" policies and the nature of work evolved. Potential commuters, accustomed to new types of flexibility in their work locations and hours, also were less willing to adapt their schedules to limited "peak" trains that run during traditional morning and evening rush hours. This "new economy" had begun to dictate how people would work, and Chicago region residents were demanding a commuter system that not only met a changing work environment but also provided a convenient and reliable alternative to the automobile for moving in-and-out of downtown Chicago and around the metropolitan area.

9. The General Assembly recognized that commuter service needed to change. In response to a looming "fiscal cliff" for public transportation in the region, on June 1, 2026, the General Assembly replaced the RTA with the Northern Illinois Transit Authority ("NITA") in order to provide transit across northern Illinois for riders as one integrated regional transit system. NITA's authority includes not only Metra's commuter service but urban mass transit and suburban bus service. The overarching goal of the NITA Act is to deliver a world-class transit system, including Metra commuter rail, and to increase ridership across the region. When transit works for riders, more riders choose transit, but only if transit adapts to meet the demand.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

10. NITA is responsible for oversight of CRD, as well as the Chicago Transit Authority ("CTA") and the Pace suburban bus agency. NITA is charged to provide coordinated and efficient regional transit planning; set budgets; oversee system performance and finances; set regional fares; and establish service standards and schedules across the three operating agencies, overseeing more than 1.3 million rides a day. The NITA Board of Directors is comprised of 20 members appointed by the Mayor of Chicago with the advice and consent of the Chicago City Council (5), the Illinois Governor with the advice and consent of the state Senate (5), the President of the Cook County Board with the advice and consent of the Cook County Board (5), and the Chairs of DuPage (1), Kane (1), Lake (1), McHenry (1), and Will (1) Counties, with the advice and consent of their respective boards.

11. Metra's service ultimately is measured by what riders experience every day, and Metra is responsible under the NITA Act with providing commuter rail marked by more frequent and reliable service, dependable connections, simpler fares, safe and accessible trips, and information riders can trust. This includes the two lines that are the subject of Metra's Complaint.

## B. The Milwaukee Road and the Joint Line

12. Metra's Milwaukee District North line runs northwest out of Chicago's Union Station to Fox Lake. Metra's Milwaukee District West line runs west from Union Station to Elgin. The two Milwaukee District lines provide approximately six million passenger rides each year and account for approximately 17 percent of Metra's overall ridership. Metra has a tenant railroad that also uses the Milwaukee District lines, CPKC, that operates freight rail service in Canada, the United

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

States, and Mexico. (For purposes of their shared use, the parties' underlying contract describes the Milwaukee District lines as the "Joint Line.").

13. To be clear, the Milwaukee District track is owned by Metra and CPKC operates on Metra's track. The Joint Line is a remnant of the once-mighty Milwaukee Road. The Milwaukee Road was a major freight and intercity passenger railroad with more than 10,000 miles of track in the upper Midwest and Pacific Northwest, also serving commuter traffic. The history of the Joint Line dates from the 1870s, when it was an integral part of The Milwaukee Road, and the history has highlights and low points. In the 1930s, The Milwaukee Road became famous for its 100-mph Hiawatha streamliners. In the 1950s, The Milwaukee Road took over operation of the famous "Cities" trains like the City of Los Angeles. But the 1950s also marked the start of a slow decline, not only at The Milwaukee Road but at other U.S. railroads. Following the creation of Amtrak in 1970, which allowed U.S. freight carriers to shed their intercity passenger operations, The Milwaukee Road looked to eliminate its unprofitable Chicagoland commuter operations. The struggling Milwaukee Road held on for another decade, before ultimately ending in bankruptcy court in Chicago.

14. The RTA, created in 1974 to subsidize commuter rail operations in Chicagoland, initially contracted with The Milwaukee Road to provide commuter service to and from downtown Chicago. When The Milwaukee Road filed for bankruptcy in 1977, it set off a long process that led to the RTA assuming operation of the two Milwaukee District commuter lines in 1982 through NIRCRC. A

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

reorganization of the RTA a year later led to the creation of CRD, which was created to fill the gap created by departing freight carriers, like The Milwaukee Road, by providing commuter rail service to the public, either directly via NIRCRC or through purchase-of-service agreements with remaining freight railroads. In 1987, efforts to reorganize The Milwaukee Road through the bankruptcy process having failed, the RTA purchased the Joint Line and simultaneously transferred ownership of the Joint Line to CRD.

15. Since 1987, CRD has been both the owner of the Joint Line and, through NIRCRC, the operator of commuter rail service on the Joint Line. Amtrak also operates intercity passenger service over portions of the Joint Line, and while intercity and commuter passenger service runs on a schedule, freight trains are not so schedule-bound. Metra, Amtrak, CPKC, and other freight trains all must be coordinated by a central designated dispatcher for safe operations over the Joint Line. At the time that the CRD purchased the Joint Line from The Milwaukee Road, dispatching responsibilities to ensure safe and efficient continuing operations on the line had been delegated by The Milwaukee Road's bankruptcy trustee to the then-existing freight operator, a predecessor of CPKC. As dispatcher, CPKC's predecessor was responsible to direct all rail traffic on the line and to set timetables. That dispatching arrangement remains in place with CPKC today.

### C. The Current Dispute—CPKC Claims that All Unallocated Capacity Belongs to CPKC

16. Metra, as the owner of the Joint Line, has never relinquished ownership and ultimate control of the Joint Line. Dispatching requires coordination

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

of passenger service, with priority given to passenger schedules, with the flexibly scheduled freight trains running on and across the Milwaukee District lines. It is a historical oddity that, while Metra owns, controls, and manages the Milwaukee District lines, dispatching duties are performed by its tenant CPKC. To be clear, neither CPKC nor any of its predecessors has ever owned the Joint Line, and neither CPKC nor any of CPKC's predecessors has ever had the right to act as the owner of the Joint Line.

17. As dispatcher of the Joint Line, CPKC is responsible for avoiding conflicts and assuring the safe operation of commuter, intercity, and freight service on the Metra-owned line. As Metra's dispatcher, CPKC also must act in a commercially reasonable manner in implementing the owner's schedule change requests. In performing its function as dispatcher of Metra, Amtrak, and freight trains over the Joint Line, however, CPKC has no right to prefer itself to the owner. Beginning in 2019, however, CPKC began taking an unprecedented and legally incorrect position regarding Metra's scheduling requests, asserting that all capacity on the Joint Line not previously allocated to a scheduled Metra train belonged to CPKC. In effect, CPKC took the position that because CPKC *might* want to run a freight train during a time not previously allocated to Metra, Metra was prohibited from adding commuter service except during rush hour "peak" periods.

18. As that dispute was coming to a head, the COVID-19 pandemic shut down the world. The shutdown temporarily shelved Metra's scheduling dispute with CPKC because commuter demand plummeted. In the United States, transit

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

ridership in the top 20 metropolitan areas had dropped 40% to 80% by December 2020. Across all federally funded agencies, transit ridership plummeted to 90- to 100-year lows across various modes that year. By June 2022, transit ridership had only recovered to about two-thirds of the pre-pandemic levels. Commuter rail traffic in northeast Illinois was no exception.

19. Commuting patterns continued to evolve post-pandemic with the widespread adoption of remote work, and these changing patterns differed depending upon the demographics of passengers on different lines. Even before the pandemic changed the nature of office work, the Joint Line served commuters whose workdays never fit the traditional 9-to-5 model. The Milwaukee District West line, in particular, serves many workers who commute to job sites, restaurants, and stores, instead of offices, and many commuters on the Joint Line work on shifts different from the traditional office 9-to-5 model.

20. For Metra, the new profile of its ridership has presented challenges that Metra is mandated by the NITA Act to meet. Not only must Metra transport business commuters returning to their downtown offices, but now must often do so outside the traditional peak hours; Metra also must transport the construction, hospitality, and service workers who start at 7 a.m. and finish at 3 p.m., or who work the late shift from 4 p.m. to 12 a.m. As Metra's rail traffic patterns continue to evolve beyond distinct peak and non-peak usage to support passenger trips throughout the day, Metra must provide Joint Line riders with additional and more frequent trains.

21. CPKC's position is that Metra cannot meet these needs because it is in CPKC's interest to reserve for itself all unallocated capacity on the Joint Line—*which Metra owns*—outside of the traditional peak periods. That is not what the parties' contract says. Instead, CPKC is contractually obligated to demonstrate how any proposed Metra schedule change outside the peak periods materially interferes with CPKC's freight operations: if they do not materially interfere, Metra's proposed schedule changes must be put into effect.

22. The General Assembly has reinforced Metra's core mission: to provide commuter rail service that meets the 21st century needs of Chicagoland and serves the public interest. Beyond its mission, Metra is now statutorily obligated by the NITA Act to meet that need. And the need can be met without materially interfering with CPKC's freight operations. For its part, CPKC cannot refuse to discuss Metra's requests to move the commuter service schedule on the Joint Line into the 21st century, cannot refuse to discuss schedule changes in good faith, and cannot peremptorily refuse to entertain any discussion of commuter service outside of the traditional peak periods. Metra is entitled to a declaration of its rights and responsibilities under its trackage agreement with CPKC, to an injunction against CPKC's refusal to engage in good faith commercial discussions, and to damages for the harm caused by CPKC's unsupported refusal to allow Metra to add commuter service that meets the Chicago region's needs.

## PARTIES

23. Plaintiff the Commuter Rail Division of the Northeast Illinois Transit Authority ("CRD" and "NITA," respectively) d/b/a Metra is a division of a unit of

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

local government, body politic, political subdivision, and municipal corporation with its principal place of business in Chicago, Illinois.

24. Plaintiff the Northeast Illinois Regional Commuter Railroad Corporation ("NIRCRC") d/b/a Metra is a public corporation with its principal place of business in Chicago, Illinois.

25. Defendant CPKC Ltd. (NYSE: CP) is a publicly traded Canadian limited company with its global headquarters and main operations center in Calgary, Alberta, Canada. Previously known as Canadian Pacific Railway Ltd. ("CPR Ltd."), CPKC Ltd. is the result of CPR Ltd.'s acquisition of control of The Kansas City Southern Railway Company and its affiliates in 2023.

26. CPKC Ltd. oversees multiple subsidiaries, all of which are in rail transportation; CPKC Ltd.'s only operating segment is rail transportation, and, due to the integrated nature of its rail network, CPKC Ltd. publicly analyzes its performance as one segment despite its multiple subsidiaries and business lines. It describes itself as "the first and only single-line transnational railway linking Canada, the United States, and Mexico." In 2025, CPKC Ltd. reported revenues of $15.1 billion.

27. Defendant Soo Line Railroad Company d/b/a Canadian Pacific Kansas City is a wholly owned subsidiary of CPKC Ltd., with its principal place of business in Kansas City, Missouri, and classified as a Class I railroad by the U.S. Surface Transportation Board ("STB") because its annual operating revenue is at least $1,094,774,354.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

28. Defendant CPKC Ltd. publicly represents that it controls Defendant Soo Line Railroad Company and that it is responsible for CPKC's relationship with Metra related to CPKC's use of the Joint Line.

## JURISDICTION AND VENUE

29. This Court has jurisdiction over CPKC because the causes of action arise from (1) the transaction of business within Cook County, Illinois, pursuant to 735 ILCS 5/2-209(a)(1); and (2) the making and performance of a contract substantially connected with this State, pursuant to 735 ILCS 5/2-209(a)(7).

30. This Court's Chancery Division has jurisdiction because this Complaint seeks declaratory and equitable relief. Declaratory judgment authority is conferred by 735 ILCS 5/2-701.

31. Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because the transactions and events giving rise to the claims set forth in this Verified Complaint, including the performance of the agreements underlying this dispute occurred within Cook County.

## FACTUAL ALLEGATIONS

### D. Metra Purchases Milwaukee Road's Joint Line Out of Bankruptcy

32. By the 1970s, The Milwaukee Road was primarily a freight railroad whose operations also included commuter service in northeastern Illinois. Like many other railroads at the time, The Milwaukee Road was struggling.

33. In 1977, The Milwaukee Road and all of its affiliated entities (collectively, the "Debtors") filed for bankruptcy protection and sought to reorganize.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

Debtors' efforts to reorganize were ultimately unsuccessful and Debtors eventually disposed of all of their assets.

34. In 1987, the RTA purchased the Debtors' joint commuter, freight, and intercity Milwaukee District lines (the Joint Line)[1] for $67,900,000. The purchase was documented in a stipulation dated September 3, 1987 (the "1987 Stipulation"), a true and correct copy of which is attached as **Exhibit A**, approved by order of the U.S. Bankruptcy Court for the Northern District of Illinois on September 4, 1987 (the "Order"), a true and correct copy of which is attached as **Exhibit B**. The 1987 Stipulation provided that "RTA shall acquire pursuant to the Condemnation Proceedings, and shall simultaneously deed, convey, and transfer to [CRD], all of the right, title, and interest of [CMC Real Estate Corporation][2] in [the Milwaukee District commuter rail lines and service]." Ex. A, 1987 Stipulation, § 1.1. Metra became the owner and host railroad of the Joint Line. As the owner and host, CRD assumed control and management of the Joint Line.

35. As its name suggests, the Joint Line was and continues to be used by other rail carriers, including providers of freight and intercity passenger service (Amtrak), called tenants, under a variety of agreements. As part of the 1987 Stipulation, the RTA also assumed the Debtors' rights and obligations under certain tenants' existing trackage agreements.

---

[1] The 1987 purchase by RTA did not include mile post 0.2 to mile post 0.57 coming out of Chicago's Union Station. Amtrak owns Chicago's Union Station.

[2] The Debtor was renamed CMC Real Estate Corporation following The Milwaukee Road's release from bankruptcy on November 25, 1985.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

36. Prior to 1987, the RTA had been a tenant operating commuter service on the Joint Line pursuant to a trackage rights agreement. That trackage rights agreement (the "1982 TRA") terminated under the explicit terms of the 1987 Stipulation because it would have been redundant and unnecessary for the RTA to have a trackage rights agreement with itself after the RTA became the owner and host of the Joint Line. As had been the case during the bankruptcy, dispatching responsibilities on the Joint Line were handled by SLRCO, Inc.[3] ("SLRCO"), another tenant on the Joint Line then operating the freight service on the Joint Line.

## E. CPKC Predecessor Is Engaged as Dispatcher on the Joint Line

37. SLRCO, a predecessor to CPKC, entered into a trackage rights agreement with the Debtors' trustee in 1985 (the "1985 TRA"), a true and correct copy of which is attached as **Exhibit C**. Through the 1985 TRA, the Debtors delegated dispatching and timetables for the Joint Line to SLRCO and permitted SLRCO to use the Joint Line for freight, subject to the RTA's priority use for commuter service pursuant to the RTA's 1982 TRA. SLRCO also contemporaneously assumed maintenance obligations for the Joint Line under a separate agreement.

38. SLRCO understood the difference between being a tenant with dispatch obligations on the Joint Line and being the owner of the Joint Line: the prior year, SLRCO had acquired other assets from the Debtors, but SLRCO had

[3] SLRCO is an acronym for Soo Line Railroad Company, named for the Minneapolis, St. Paul, and Sault Ste. Marie Railroad ("MStP&SSM"), and commonly known as the Soo Line after the phonetic spelling of Sault. It was formed in 1961 by the consolidation of MStP&SSM with two other subsidiaries of CPKC predecessor Canadian Pacific, also known as "CP."

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

expressly declined to purchase the Joint Line. The 1985 TRA governed SLRCO's rights and obligations with respect to the Joint Line for the next eight years.

**F. 1993 Supplement Reaffirms Priority of Commuter Service on the Joint Line**

39. Over time, the RTA became concerned with the effectiveness of SLRCO's maintenance of the Joint Line. The RTA also wished to clarify certain obligations assumed by SLRCO under the 1985 TRA and confirm that commuter rail traffic on the Joint Line was paramount. So, in 1993, CRD, by this time doing business as Metra, and Soo Line Railroad Company, d/b/a CP Rail System ("CP"), as successor in interest to SLRCO, entered into an agreement to supplement the 1985 TRA (the "1993 Supplement"), a true and correct copy of which is attached as **Exhibit D**.

40. Through the 1993 Supplement, Metra, as the host and owner of the Joint Line, assumed certain maintenance obligations for the Joint Line. The 1993 Supplement also clarified that as the dispatcher on the Joint Line, CP, may not "object to Metra's operations of peak period trains" even if Metra's "operations unreasonably interfere with CP's or third parties' ability to provide efficient freight or intercity passenger service." Ex. D, 1993 Supplement, § 8.15. The 1993 Supplement defined "peak period trains" as those scheduled for certain zones during certain morning commute times, generally between 5:00 am and 9:00 am, and during certain evening commute times, generally between 4:00 pm and 7:00 pm. Ex. D, 1993 Supplement, § 8.15. For non-peak period trains, Metra retained the right to change the schedule on the Joint Line, which Metra owned, with CP's prior written consent, "which may not be unreasonably withheld; providing that such change

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

shall not materially interfere with freight operations." Ex. D, 1993 Supplement, § 8.16.

41. Thus, peak period commuter trains always have priority, even if they unreasonably interfere with CP's (now CPKC's) ability to provide efficient freight service, and non-peak period commuter trains have priority, based on a schedule determined by Metra, the owner, so long as those trains do not materially interfere with CP's (now CPKC's) freight operations.

42. The parties separately agreed to Metra's addition of four non-peak trains related to a new Metra service route and preemptively agreed in principle to Metra's addition of ten more non-peak trains over specified trackage in specified directions, with CP's (now CPKC's) consultation and consent (not to be unreasonably withheld) to the specific schedules.

43. From 1993 through the early 2000s, commuter rail ridership increased. Pursuant to the parties' agreement, Metra provided notice of various schedule changes during this time and CP provided its consent to the proposed non-peak schedule changes.

44. Commuter rail ridership slowed following the 2008–2009 recession and ebbed and flowed in the following decade. In early 2018, during a trough in demand and public funding, Metra eliminated certain non-peak trains on the Joint Line dispatched by CP.

**G. 2019 Breach of Contract**

45. In March 2019, Metra's Executive Director and CEO Jim Derwinski sent a letter to CP Executive Vice President, Operations Robert Johnson seeking

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

CP's consent to a "pilot program of new reverse commuting operations between Chicago and Lake Forest." The pilot program came at the request of a group of Lake County business leaders.

46. On March 12, 2019, CP's Johnson responded that CP's consent to non-peak schedule changes in the late 1990s and early 2000s "have negatively impacted [CP's] operating capacity" without explaining *how* CP's prior consent actually impacted its past operating capacity or how the proposed pilot program would materially interfere with current freight operations. Johnson said that CP intended to "continue to abide by the peak period provisions of the existing Agreement" and suggested that "[i]f Metra can make its proposed changes work within the existing Peak Period windows that may also be an option."

47. On behalf of CP, Johnson did not express intent to abide by the parties' agreement regarding non-peak period trains, *i.e.*, that CP could not withhold its consent to non-peak schedule changes unless those proposed changes materially interfered with freight operations. Instead, Johnson unilaterally cut off discussions about Metra's non-peak proposal.

48. On March 26, 2019, Derwinski asked CP to "reconsider Metra's request to shift two . . . trains to the non-peak period." Derwinski explained how Metra had assessed the possible impact on CP and referred to "a Metra internal analysis of the impact of the new service on CP's traffic dated February 4, 2019, previously delivered to CP and attached for your convenience." Derwinski further explained that the Metra analysis included "a detailed discussion of Metra's understanding of

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

the impact of the new reverse commute trains on CP traffic. The analysis is buttressed by CP's addition of ten daily freight trains without impacting Metra's schedule."

49. Consistent with CP's obligations under the 1993 Supplement, Derwinski requested that CP provide "an analysis in the same degree of detail so that all parties can understand how the mere adding of two trains has resulted in CP's decision" to withhold its consent to the Joint Line owner's schedule changes.

50. Derwinski also shared the impact of CP's denial on the local community: "If CP does not consent, Metra is in an awkward position with our local partners and elected officials if we have no explanation beyond a blanket CP refusal."

51. Metra additionally offered a way forward for both Metra and CP by asking for CP's consent on a pilot basis for one year and proposing the parties "assess the true demand and the actual traffic impacts" given that "there appears to be ample excess capacity."

52. Metra even offered to conduct Rail Traffic Controller ("RTC")[4] modeling at Metra's expense to allow the parties "to have future fact based capacity discussions." CP only needed to "provide the appropriate train scheduling, movement data and growth assumptions to input into the model."

---

[4] RTC is a simulation software developed by Berkeley Simulation Software, LLC that models train dispatching and rail system capacity.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

53. Separately, Metra's Director of Contracts Jack Bauer sent a letter to Chuck Hubbard, CP's Director of Interline & Passenger, South: "In early 2018, Metra made a reduction to its commuter service. [Metra] now intends to reinstitute weekend trains which were deleted from that previous schedule [on a] 90-day trial basis [that] could be made permanent."

54. On April 2, 2019, CP's Johnson responded to Derwinski by flatly rejecting Metra's suggestion of RTC modeling because it is "a snapshot in time typically based on past history." Johnson offered no other methodology for objectively assessing capacity, no description of material interference with freight operations, and no rationale for CP's blanket refusal to discuss non-peak schedule changes to commuter service on the Joint Line.

55. Johnson's only justification for CP's withholding of consent was CP's "[p]rotection of capacity," which Johnson did not define except to claim it is not "confined to today's business and tomorrow's growth."

56. Johnson also stated that Metra, a public agency partially funded by taxpayers, should "consider seeking the capital necessary to add additional capacity" for public use so that CP could "protect" capacity for its private use, *i.e.*, CP asked Metra to subsidize the addition of high-cost capacity using public funds for CP's shareholders' benefit.

57. Johnson then unilaterally foreclosed any further discussions of Metra's use of non-peak capacity:

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

> We do not intend to engage in a letter writing battle. This is our position in the matter. It is not subject to negotiation or change outside the path forward we have outlined.

Johnson stated, "We do not intend to engage in a letter writing battle. This is our position in the matter. It is not subject to negotiation or change outside the path forward we have outlined." Far from demonstrating why Metra's request was unreasonable or providing Metra with any evidence that Metra's request would materially interfere with CPKC's freight operations as required by the parties' agreement, CPKC peremptorily dismissed Metra's request. Metra's Bauer's proposal was similarly rejected out of hand.

**H. COVID-19 Pandemic Changes Commuter Rail Use**

58. The COVID-19 pandemic shattered the global economy in 2020. Ridership on all forms of public transportation, including Metra, dropped to record lows.

59. Since 2022, ridership has recovered in part and commuter usage patterns have changed. By 2024, commuter railroads nationwide, including Metra, experienced an approximately 60% average recovery in ridership compared to pre-pandemic levels. But the post-pandemic distribution of ridership is different. The "gig" economy and remote and hybrid work models have reduced peak period ridership but increased the demand for off-peak period commuter service. Workers,

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

such as those in hospitality and construction, who have always relied on early morning and late trains still need to get to work. At the same time, non-peak personal rail travel has increased.

60. In response to post-pandemic market changes, commuter rail operators have acknowledged the need to evolve. Rail providers throughout the country, including Metra, have increased ridership recovery by adopting new 21st century models.

61. The model being implemented by Metra, called "regional rail," has three main characteristics: (1) all day service in both directions in and out of the city center; (2) standardized predictable scheduling; and (3) timetable integration with other regional transportation services (*e.g.*, bus and subway).




62. Metra adopted the regional rail model in 2023 as part of a new strategic plan. Metra has begun implementing this regional rail model on lines within its system with expanded service throughout the day, including weekend service, in cooperation with other freight railroads that operate on the same lines. CPKC has blocked Metra from moving toward regional rail on the Joint Line.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

## I. 2024–2025 Breach of Contract

63. In July 2024, Metra sent a schedule change proposal (the "July 2024 Proposal") to CP's successor, CPKC. The schedule change was intended to implement the initial stages of Metra's post-COVID strategic plan for commuter service, including on the Joint Line. CPKC did not respond.

64. In early August 2024, Metra twice reached out to CPKC requesting a substantive response. On August 13, 2024, CPKC's Senior Vice President of Operations Nick Walker responded with a letter to Metra's Senior Director of Interline Operations Steve Cork, inaccurately construing the 1993 Supplement as prohibiting Metra, the Joint Line's owner, from adding service during non-peak periods because all non-allocated capacity on the Joint Line belongs to CPKC. Specifically, CPKC took the position that Metra's July 2024 Proposal would "push the overall train count beyond the agreed limit" and would "limit the capacity available for CPKC." Neither criterion appears in the 1993 Supplement and neither demonstrates that Metra's requested schedule change proposal would materially interfere with freight operations on the Joint Line.

65. Walker's letter claims that the effect of Metra's request on CPKC's capacity was "shrinking CPKC's operating window [by] 36 minutes eastbound and 3 minutes westbound." CPKC did not describe any material impact on its current or planned freight operations. Walker concluded by offering to discuss *only* moving Metra trains from non-peak to peak periods, reiterating CPKC's non-contractual position that Metra cannot add any commuter trains during non-peak periods, even if those trains do not materially interfere with freight operations.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

66. In October 2024, the parties' representatives followed up. Metra asked for the reasons behind CPKC's position and CPKC committed to providing them, but CPKC never did.

67. On November 19, 2024, Metra's Cork emailed Walker and others at CPKC with an alternative proposal that pushed back one train "by 15 minutes and maintains all other proposed trains and times, which will help protect the CPKC freight window."

68. On January 23, 2025, Will Wangerin, CPKC's Director of Interline and Passenger, US North, responded to Cork's email reiterating that "Metra is moving Peak Period trains to Off-Peak times [which] puts Metra over the agreed amount of Off-Peak Period train counts agreed to in [a 2008 schedule change agreement] and what Metra ran in their pre-covid schedule." Wangerin's response provided no support for material interference with freight operations as required under the 1993 Supplement for CPKC to withhold consent to the non-peak schedule request.

69. On March 7, 2025, Jenny Kane, Metra's Director of Rail Contract Management and Special Projects, tried again, explaining that "CPKC's interpretation of the [1993 Supplement's] language regarding train slots and capacity is inconsistent with the [explicit terms] of the agreement and Metra is reiterating its July 3, 2024 request." Kane specifically noted that "Metra disagrees with the CPKC interpretation that any available/unused non-peak capacity is reserved solely for CPKC's service growth and service flexibility" and that "Metra strongly disagrees that a reduction of a service window by three minutes

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

[westbound] constitutes a material impact to CPKC when the proposed schedule provides CPKC unfettered access to the main line for two hours [at times] when no Metra trains are operating. With respect to the 36-minute reduction of the eastbound window, please provide more detail as to which Metra trains would cause such reduction so we can work to specifically address such concerns." Kane concluded, "[i]n the event that CPKC denies this request, please provide a detailed explanation of the material impact to freight service which would result from this proposed schedule change."


Metra disagrees with the CPKC interpretation that any available/unused non-peak capacity is reserved solely for CPKC's service growth and service flexibility.

70. CPKC did not give its consent and did not provide a detailed explanation of how the July 2024 Proposal would materially interfere with freight operations as required by the 1993 Supplement.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

71. Instead, Walker responded on March 20, 2025, misstating CPKC's limited discretion and dispatching rights. Walker began by referencing the terminated 1982 TRA between RTA as Joint Line tenant and the Milwaukee as Joint Line owner, which "restricted Metra's ability to expand its commuter train timetable without the Milwaukee's consent thereby preserving the Milwaukee's control of its capacity." But, as CPKC knows, that is not the agreement that gives CPKC its current dispatching responsibilities. Those responsibilities arise from the 1985 TRA and the 1993 Supplement with Metra and the operative agreements impose obligations on CPKC as dispatcher (1) to prioritize commuter rail service during all peak periods, and (2) to accommodate commuter rail service during non-peak periods absent demonstrated material interference with freight operations.

72. On April 24, 2025, Metra responded emphasizing the lack of contractual support for CPKC's assertions: "[T]here is no language in the relevant agreements supporting CPKC's positions: 1. Of reserving available/un-used non-peak capacity only for CPKC's use and service; 2. Requiring a corresponding reduction to Metra's peak periods in exchange for Metra service expansions in non-peak periods; or 3. Applying a maximum train count to Metra's operations in either the peak or non-peak periods."

73. During 2025, CPKC and Metra also met quarterly in owner-dispatcher meetings and discussed the impasse without resolution. CPKC has maintained its position that all currently unallocated capacity on the Joint Line during non-peak hours is reserved for CPKC's unspecified future use—and CPKC has continued to

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

withhold its consent to Metra's addition of any non-peak service without providing any supporting evidence of material interference with CPKC's freight operations. CPKC also has demanded that Metra agree to reductions to the duration of the peak periods in return for any additions of non-peak service and has sought to impose other conditions on Metra's use of its own property not provided for in the 1993 Supplement.

**J. NITA Act**

74. Metra's 2023 strategic plan embraced a 21st century evolution into regional rail. Now, regional rail is the law. Effective June 1, 2026, the NITA Act requires the development of new service standards for Metra which "shall include the transition of commuter rail in the metropolitan region to a regional rail service pattern or the retention of commuter rail with additional regional rail service." 70 ILCS 3615.6.01(g). The new service standards must be implemented by December 31, 2027.

75. Metra is committed to continuing to evolve with NITA, Chicagoland business needs, and, most importantly, the needs of Metra's riders. Metra strives to "proactively address evolving transportation needs [by] providing regional rail service that supports sustainable connected communities."[5] To make these changes, Metra also is committed to working cooperatively with the other railroads with whom it shares trackage. There should be no reason that CPKC is an exception on track that Metra owns.

---

[5] Metra, https://metra.com/mission-vision-goals.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

76. To achieve its mission, Metra must adjust its non-peak schedules to meet the needs of the riders and communities that Metra serves. CPKC has blocked Metra's proposed schedule changes and refused to negotiate in good faith to implement them in breach of its contractual obligations as Metra's tenant and dispatcher on the Joint Line. CPKC's breaches undermine Metra's obligations to its riders, Illinois taxpayers, and the broader public interest.

## COUNT I
## Declaratory Judgment Pursuant to 735 ILCS 5/2-701

77. Metra repeats and realleges every allegation contained in the paragraphs above as if fully set forth here.

78. An actual, ripe, and justiciable controversy exists between Metra and CPKC concerning the parties' respective rights and obligations under the 1985 TRA, 1987 Stipulation, and 1993 Supplement.

79. Metra has a tangible legal interest in this controversy. Metra has the right to use, control, and manage the Joint Line, which Metra owns, and to change the scheduled use on its line during non-peak periods subject to its dispatcher CPKC's consent "which may not be unreasonably withheld."

80. CPKC's refusal of Metra's proposed service changes in breach of the express contractual criteria governing the parties' relationship directly impedes Metra's right to use, control, and manage the Joint Line. Specifically, CPKC has asserted that it may unilaterally and conclusively (1) take for itself unallocated capacity on the Joint Line and (2) terminate negotiations without good faith by

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

improperly refusing and/or conditioning Metra's requested schedule changes during non-peak periods.

81. The controversy between the parties is genuine and immediate. Metra faces imminent loss or interference with its business absent a judicial declaration of its rights.

82. Pursuant to 735 ILCS 5/2-701, Metra is entitled to a declaration that:

a. As the owner, Metra owns, controls, and manages the Joint Line;

b. Metra owns the unallocated capacity on the Joint Line and may implement schedule changes during non-peak periods that adjust or add trains, including commuter trains and the trains of Metra's other tenants, that do not materially interfere with CPKC's freight operations on the Joint Line;

c. CPKC, as the Joint Line's tenant and dispatcher, must engage in a good faith and commercially reasonable negotiating process until resolution of any non-peak period schedule changes proposed by Metra; and

d. CPKC must demonstrate material interference with freight operations using objective and commercially reasonable processes and methodologies in support of any denials of consent to Metra's proposed schedule changes on the Joint Line during non-peak periods.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

## COUNT II
## 2024–2025 Breach of Contract

83. Metra repeats and realleges every allegation contained in the paragraphs above as if fully set forth here.

84. The 1993 Supplement is a valid and enforceable contract.

85. Metra has performed all of its obligations under both the 1985 TRA and the 1993 Supplement.

86. From 2024 through present, CPKC has breached the 1993 Supplement by unreasonably withholding its consent to Metra's July 2024 Proposal.

87. CPKC failed to participate in good faith commercially reasonable negotiations regarding Metra's July 2024 Proposal by conditioning its consent on unreasonable concessions by Metra.

88. CPKC also failed to employ objective and commercially reasonable processes and methodologies to demonstrate material interference with freight operations.

89. As a result of CPKC's breach of the 1993 Supplement, Metra has been damaged.

90. Metra has no adequate remedy at law. Monetary damages will not adequately compensate Metra. Unless CPKC is ordered to specifically perform under the 1993 Supplement, Metra will suffer irreparable harm caused by these breaches of the 1993 Supplement.

91. Metra is entitled to an injunction directing specific performance of the 1993 Supplement, and in addition, Metra is entitled to monetary damages in an

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

amount to be determined at trial for CPKC's breaches to date, its costs and attorneys' fees, and any further relief that the Court deems appropriate.

**COUNT III**
**Breach of Covenant of Good Faith and Fair Dealing in 2024–2025**

92. Metra repeats and realleges every allegation contained in the paragraphs above as if fully set forth here.

93. In the 1993 Supplement, Metra delegated limited discretion to CPKC, as the Joint Line dispatcher, to consent to Metra's non-peak schedule changes.

94. CPKC owed Metra a duty to exercise that discretion in good faith, including using objective and commercially reasonable processes and methodologies.

95. The parties reasonably expected that Metra's traffic volumes, service requirements, and market conditions would change over time during the course of their agreement and that CPKC would consent to Metra's non-peak schedule changes that do not materially interfere with freight operations.

96. As the owner of the Joint Line, Metra reasonably expected its dispatcher to exercise its limited discretion to consent by negotiating using objective and commercially reasonable processes and methodologies for assessing material interference with freight operations.

97. Instead, CPKC arbitrarily and capriciously and without good faith withheld its consent for its own benefit in violation of the agreement's express terms.

98. As a result of CPKC's breach of the covenant of good faith and fair dealing, Metra has been damaged.

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

99. Metra has no adequate remedy at law. Monetary damages will not adequately compensate Metra. Unless CPKC is ordered to specifically perform under the 1993 Supplement, Metra will suffer irreparable harm caused by CPKC's breach of the covenant of good faith and fair dealing.

100. Metra is entitled to an injunction directing specific performance of the 1993 Supplement in good faith, and in addition, Metra is entitled to monetary damages in an amount to be determined at trial for CPKC's breaches to date, its costs and attorneys' fees, and any further relief that the Court deems appropriate.

**COUNT IV**
**2019 Breach of Contract**

101. Metra repeats and realleges every allegation contained in the paragraphs above as if fully set forth here.

102. The 1993 Supplement is a valid and enforceable contract.

103. Metra has performed all of its obligations under both the 1985 TRA and the 1993 Supplement.

104. In 2019, CPKC breached the 1993 Supplement by unreasonably withholding its consent to Metra's proposed addition of non-peak "reverse commute" trains to Lake County ("2019 Reverse Commute Proposal").

105. CPKC failed to participate in good faith commercially reasonable negotiations regarding Metra's 2019 Reverse Commute Proposal by unilaterally terminating negotiations prior to resolution.

106. CPKC also failed to employ objective and commercially reasonable processes and methodologies to demonstrate material interference with freight

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

operations by rejecting RTC modeling and failing to offer an alternative commercially reasonable process or methodology.

107. As a result of CPKC's breach of the 1993 Supplement, Metra has been damaged.

108. Metra has no adequate remedy at law. Monetary damages will not adequately compensate Metra. Unless CPKC is ordered to specifically perform under the 1993 Supplement, Metra will suffer irreparable harm caused by CPKC's breach of the 1993 Supplement.

109. Metra is entitled to an injunction directing specific performance of the 1993 Supplement, and in addition, Metra is entitled to monetary damages in an amount to be determined at trial for CPKC's breaches to date, its costs and attorneys' fees, and any further relief that the Court deems appropriate.

**COUNT V**
**Breach of Covenant of Good Faith and Fair Dealing in 2019**

110. Metra repeats and realleges every allegation contained in the paragraphs above as if fully set forth here.

111. In the 1993 Supplement, Metra delegated limited discretion to CPKC, as the Joint Line dispatcher, to consent to Metra's non-peak schedule changes.

112. CPKC owed Metra a duty to exercise that discretion in good faith, including using objective and commercially reasonable processes and methodologies.

113. The parties reasonably expected that Metra's traffic volumes, service requirements, and market conditions would change over time during the course of

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

their agreement and that CPKC would consent to Metra's non-peak schedule changes that do not materially interfere with freight operations.

114. As owner of the Joint Line, Metra reasonably expected its dispatcher to exercise its limited discretion by negotiating using objective and commercially reasonable processes and methodologies for demonstrating material interference with freight operations.

115. Instead, CPKC arbitrarily and capriciously and without good faith withheld its consent for its own benefit in violation of the agreement's express terms.

116. As a result of CPKC's breach of the covenant of good faith and fair dealing, Metra has been damaged.

117. Metra has no adequate remedy at law. Monetary damages will not adequately compensate Metra. Unless CPKC is ordered to specifically perform under the 1993 Supplement, Metra will suffer irreparable harm caused by CPKC's breach of the covenant of good faith and fair dealing.

118. Metra is entitled to an injunction directing specific performance of the 1993 Supplement in good faith, and in addition, Metra is entitled to monetary damages in an amount to be determined at trial for CPKC's breaches to date, its costs and attorneys' fees, and any further relief that the Court deems appropriate.

## PRAYER FOR RELIEF—ALL COUNTS

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

FILED DATE: 10/13/2026 11:56 AM 2026CH09872

A. Declaring that Metra owns, controls, and manages the Joint Line, that Metra has a right to change its scheduled use during non-peak periods, and that CPKC may not unreasonably withhold its consent without demonstrating based on objective and commercially reasonable processes and methodologies that such changes materially interfere with freight operations;

B. Ordering specific performance of the 1993 Supplement;

C. Awarding Metra actual, incidental, and consequential damages for Defendants' breaches of the 1993 Supplement and covenant of good faith and fair dealing to date;

D. Awarding attorneys' fees, costs, and expenses incurred in this action; and

E. Any such other and further relief as this Court deems just and proper.

Dated: October 13, 2026

Respectfully submitted,

*/s/ Michael Dockterman*

Michael Dockterman
Cara Lawson
Kathleen Murray Capo
Ian McKay
**MCDERMOTT WILL & SCHULTE LLP** (#90539)
444 West Lake Street
Chicago, IL 60606
(312)-984-2167
mdockterman@mcdermottlaw.com
clawson@mcdermottlaw.com
kmurraycapo@mcdermottlaw.com
imckay@mcdermottlaw.com

*Attorneys for Metra*